**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PAULA ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | No. 02 C 8452 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| FOREST PRESERVE DISTRICT OF | ) | |
| COOK COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The sole remaining claim in this case is one under the Americans with Disabilities Act, 42 U.S.C. § 121101 *et seq.* Plaintiff Paula Adams alleges that the Forest Preserve District of Cook County asked her to do tasks during the summer of 2001 that were outside her doctor-imposed limitations and then fired her on October 1, 2001. Plaintiff, who suffers from carpal tunnel syndrome, chronic back pain, and fibromyalgia, alleges that the District's refusal to accommodate her and its decision to fire her were based on disability discrimination. The District argues that plaintiff could not perform the essential functions of her job and that she was fired because she was absent for two months, failing to show up for work or even to call in to explain why she wasn't at work.

Plaintiff appealed her termination to the Employee Appeals Board ("EAB"), which held a hearing at which plaintiff, her supervisor, and her doctor testified. Each side submitted exhibits and filed post-hearing briefs. In a four-page opinion, the EAB Commissioner denied plaintiff's

appeal, finding that the District's decision was justified because there was no reasonable explanation for why plaintiff failed to notify the District about why she was not at work. Relying on the testimony and exhibits from that hearing, the District filed this motion for summary judgment.

## FACTUAL BACKGROUND

In 1996, plaintiff began working for the District's personnel office, which was located on the first floor of the District's two-story workplace. In 1999, she became dissatisfied with this job and requested a transfer to the Special Events office located on the second floor. There was no elevator in the building.

The District granted her request and she began working for Eloise Saperstein. The Special Events office was in charge of about 10 special events a year, such as the Senior Citizens picnic, most of which were held in the late spring and summer. Plaintiff, whose job was to help prepare for these events, was the only full-time employee working with Saperstein.

This case focuses on whether plaintiff could do her job given her disabilities. Plaintiff now describes these disabilities as carpal tunnel syndrome, severe back pains, sciatica, and fibromyalgia. It is not entirely clear when these disabilities originally manifested themselves. Plaintiff states that she first saw a doctor about her carpal tunnel syndrome in 1994. In 2000, plaintiff began experiencing problems with her upper back that caused her to experience a lot of pain in her neck, arms, and back. The fibromyalgia was apparently diagnosed in 2001. These disabilities became worse over time and eventually made it difficult for her to perform parts of her job and also to even come to work.

Plaintiff alleges generally that Saperstein was not very understanding or accommodating with regard to her disabilities. Most of the facts in this case revolve around the various doctor's notes plaintiff submitted to either explain why she was absent or would be absent in the future or to inform the District of medical limitations that her doctors had imposed with regard to what she could do on the job.

The first incident for which we have any evidence occurred in October 2000 (or perhaps August 2000) when Saperstein asked plaintiff to carry some things that were too heavy for her to carry. Plaintiff states that she then "reminded" Saperstein of her doctor's restriction.[1] Saperstein insisted that she did not know where the note containing the doctor's restriction was and that plaintiff should get another one. Plaintiff then had Dr. Leary, her primary care physician at the time, fax a note to plaintiff and she then gave the note to Saperstein. The note states:

> Pt has carpal tunnel syndrome. Please grant her the reasonable accommodations of [a] typing chair and mouse pad, etc. to minimize symptoms.

(Em. Ex. 1.)[2] The note contains no reference to any limitation regarding lifting heavy things. Insofar as we know, the requests for the typing chair and mouse pad were granted.

The next incident occurred in January 2001 and is somewhat similar to the first. Plaintiff described this incident in her EAB testimony:

> Once again, Miss Saperstein would ask me to carry things that I could not carry that [were] too heavy. I would remind her of my doctor's restriction. Miss

---

[1]Plaintiff's testimony leaves the impression that she previously submitted a note containing a doctor's restriction, but there has been no evidence submitted to verify this fact.

[2]There is a slight discrepancy in the record in that plaintiff testified that the note (Em. Ex. 1) was faxed on October 8, 2000 and that this incident took place at the same time. Yet, the note is dated 8/8/00. So plaintiff may have misread the date on the note. There does not appear to be any relevant difference whether the event occurred in August or October.

Saperstein would say, I don't know where it is. I need a copy from your doctor. I called Dr. Leary. He faxes it to me. I give it to Miss Saperstein.

(Tr. 51.) This note from Dr. Leary states:

Pt has long-standing work restrictions [relating] to carpal tunnel syndrome. Please avoid having her lift greater than 10 lbs.

(Em. Ex. 2 – first page.) This is the first note in the record that contains a limitation on lifting heavy things.[3]

The remaining incidents occur during the summer and fall of 2001, roughly from late May until early October. Up until this point, it is not clear how often plaintiff missed work due to her disabilities. But there is no dispute that from June 15th until she was fired on October 1st, plaintiff missed large chunks of work. According to her work attendance chart kept by the District, plaintiff showed up for only seven and a half days during this period – July 9th, July 10th, and 1.5 hours on July 11th and then the week of July 23rd through July 27th. (M. Ex. 2.) Although it is undisputed that plaintiff's absences were all caused by her disabilities, those absences are explained on this chart by different letter codes such as AN (absent without pay), DO (days off), V (vacation), SP (sick pay), etc. Eventually, plaintiff ran out of sick days.

The facts concerning this period are again organized around the doctor's notes submitted by plaintiff. On May 23, 2001, plaintiff visited Dr. Cantu who was a chiropractor treating her for back pain. After the visit, Dr. Cantu prepared a note that was faxed from his office (while

_____

[3]Plaintiff had to carry boxes containing products like candy bars, shampoo, and peanuts, which were divvied up into little "goodie bags" that would be taken to the event and given away to participants such as the senior citizens at the senior citizens picnic. This task was required for every special event.

plaintiff was standing there) to Cecelia Handy who was the District's personnel director at the time. This note stated:

> To whom this may concern, the above named patient remains under our care for a lower back condition. She may return to work on 05/29/01 with limitations of no lifting of boxes/materials greater than 10 (ten) pounds, and no prolonged and/or repetitive climbing up/down stairs. These activities may aggravate her condition prolonging proper healing.

(Em. Ex. 2 – third page.) Based on this note, it appears that plaintiff also missed some work during the end of May.

Although Dr. Cantu indicated in the above note that plaintiff hoped to return to work on May 29th, it is not clear whether she actually did so because Dr. Cantu faxed a second note on June 1st, stating that plaintiff would not return to work on June 4th:

> To whom this may concern; the above named patient, in my professional opinion, is not ready to return to work on 06/04/01. That determination will be assessed then. Prolonged sitting and climbing up/down stairs will aggravate her condition, as she is in a recent aggravation due to climbing up/down stairs at her bank. Call if any questions.

(Em. Ex. 2 – second page.) This note contains the first reference we have seen to a limitation on "prolonged sitting."

It is not clear whether plaintiff returned to work on June 4th but on June 8th she sent a letter to the District stating that her son would pick up her check, which would suggest that she was still not back to work. This letter also requested that all future checks be mailed to her and requested vacation leave for two weeks from Friday June 22 until Friday July 6th. (M. Ex. 3.) Plaintiff later testified that she was not really taking a vacation but had run out of sick leave.

A week later, on June 15, 2001, plaintiff had Dr. Cantu's office fax another note to the District. This note was longer and typewritten and contained similar job restrictions. It also

stated that plaintiff would not be ready to return to work until July 9th – *i.e.* over three weeks

later. The medical restrictions set forth in this note were as follows:

> Her condition warrants the avoidance of prolonged sitting of greater than 45 minutes to an hour and/or prolonged standing/walking of greater than one to two hours. She is also limited to lifting/carrying materials, weighing less than 10 pounds. She is also refrained and highly recommended not to climb up and/or down stairs on a frequent, constant, repetitive occurrence.

(Em. Ex. 3.)

On July 9, plaintiff returned to work. She worked that day, the next day, and then only 1.5

hours on the third day. At the EAB hearing, she explained why she left early on the third day:

> I got there. There was a whole lot of invoices on my desk to be typed and sent out. I asked Miss Saperstein if she had anything that does not require me to go up and down the stairs on a repetitive basis, if she does not have anything that requires me to do any lifting. She said no. I was there for an hour and a half.

(Tr. 60.) Plaintiff says that she left because it was clear that she was going to be confronted with

this same issue over and over again.

Several days later, Dr. Cantu faxed a note similar to the previous one. This note stated

that plaintiff's condition had been aggravated because of something she did at home on July 8th,

which would have been the Sunday before she returned to work on Monday July 9th, and that it

was further aggravated at work:

> The patient's condition flared up at home on July 8, 2001, due to prolonged standing of approximately 3-1/2 to four hours. She returned back to work on July 9, 2001, at which point her condition became reaggravated at work while climbing up and down stairs that morning on a repetitive continued basis as per patient's recollection.

(Em. Ex. 5.) Dr. Cantu concluded that she should be off work until July 23rd.

On July 23rd, plaintiff returned to work at which point this issue came to a head. When

she arrived, there were a lot of bills on her desk that Saperstein said had to be paid. Saperstein

also needed plaintiff's help with events that were going on at the time. Plaintiff was asked to get helmets out of a van and hand them out to kids in an event called Heads Up For Safety. Plaintiff responded that these tasks – in particular the typing – violated her medical restrictions.

Later that day, the District set up a meeting with plaintiff, Saperstein, Mr. Nevius (the Superintendent), P.J. Colorton (the assistant superintendent), and Joanne Robinson all attending. Plaintiff first asked why she was being forced to perform duties outside her job description to which Robinson and Colorton responded that one of plaintiff's jobs was to follow the directions Saperstein gave her. Plaintiff then asked about the medical limitations imposed by her doctors. According to plaintiff, no one at the meeting responded to her statement. Plaintiff finally requested a transfer from the Special Events department. Colorton responded that the District "had no place to put [her]." (Tr. 70.)

After this meeting, plaintiff worked the rest of the week. She testified that "all" of her regular duties during this week were outside her medical restrictions:

Q.   And what types of things were you doing on the 24th, 5th, 6th, and 7th?

A.   My regular duties.

Q.   And which of those duties were you told to do that was outside medical restrictions?

A.   All of it. The typing, the going up and down the stairs on a repetitive basis, the lifting and carrying. I was directed to do the job, and that's what I did.

(Tr. 68.)

Plaintiff's last day of work was Friday, July 27th. On Monday, July 30th, which was her next scheduled work day, plaintiff called the office at around 8:30 a.m. and spoke to Rebecca Theadoris and told her: "because of my reaggravation that I would not and I could not come in to

the office and that I wanted to make sure that Miss Saperstein [was] notified of this." (Tr. 70-71.) Plaintiff explained at the hearing that she called Law Enforcement, rather than Saperstein, because that is what she had been told to do by Saperstein and by the general superintendent.

Plaintiff also called in the next day to make sure that Saperstein received the message. She spoke to a male law enforcement officer in the Law Enforcement Department. Plaintiff told this person that she would not be in to work because her condition had been reaggravated and that she wanted Saperstein to be notified. Plaintiff then called Carol Tully, switchboard operator, and told Tully about the difficulties she was having in making sure Saperstein got her message. Plaintiff eventually called Saperstein and left a message on her voice mail.

On August 1, 2001, plaintiff saw Dr. Maskall, who was then her primary care physician for insurance reasons. Plaintiff complained to Dr. Maskall that she "wasn't able to perform the assigned tasks on the job" due to pain in her arms, back, and neck. (Tr. 117.) Dr. Maskall concluded that plaintiff had "deficiency in the ulnar and median and radial nerves" and that "her range of motion and pain which were elicited was a result of nerve impingement." (Tr. 118-19.) He prescribed several types of analgesics and recommended physical therapy three times weekly for a period of three or four weeks at which point she would be reevaluated. He testified that he wrote a note to the District on August 1st stating that plaintiff would be off as of August 1st for a minimum of one month. (There is apparently no copy of this note now available.)

Dr. Maskall next saw plaintiff on September 10th. After examining her, he concluded that she was still not ready to work and was not improving even after the physical therapy, the muscle relaxation, and the pain management.

On Sept 19, 2001, the District sent plaintiff a letter stating that a hearing for "job abandonment" was scheduled for October 1st.  The District's employee handbook defines job abandonment in a specific way – namely an employee being absent from work for three consecutive days "without notifying his/her supervisor or designee."  (M. Ex. 5.)  The letter stated that it was mandatory for plaintiff to attend this hearing and gave her a phone number to call if she had any questions.  It is undisputed that plaintiff received this letter 10 days before the scheduled hearing.

But plaintiff never showed up for the hearing, nor did she call to say that she couldn't make it.  Saperstein and the hearing panel waited an hour.  Although plaintiff did not attend the hearing, she did show up for her an appointment with Dr. Maskall that same day at around the same time.  She later explained that she missed this hearing because Dr. Maskall supposedly told her that "her health comes first."

After examining plaintiff on October 1st, Dr. Maskall wrote a note explaining that plaintiff had been off from work because of "recurring" pain and that she had been going to physical therapy for three times a week, which gave her only "limited relief."  (Em. Ex. 7.)  He stated that she could return to work on October 8th but with the limitation that she "only engage in sedentary activities, not including typing, lifting, climbing, bending continuously in an eight-hour workday."  Plaintiff claims that this letter was faxed to the District, an assertion the District denies.

As a result of the October 1st hearing, plaintiff was discharged in a letter dated October 2nd.  She appealed this decision to the Employee Appeals Board.  After a hearing, the Commissioner concluded that the decision to fire plaintiff was "amply supported by the

evidence."  The Commissioner noted that the District had permitted plaintiff to "remain off work for nearly four months" and that her supervisor even "took pains to ensure that [plaintiff] would be paid for a portion of her absences."  The Commissioner believed that plaintiff was well aware of the District's policies given that she worked in its personnel office.

<u>ANALYSIS</u>

Although plaintiff is asserting a single claim under the ADA, she has two theories.  She alleges first that the District failed to provide reasonable accommodations and second that the District fired her based on a the pretextual reason that she had failed to show up for work when the real reason was disability discrimination.

**I.      Reasonable Accommodations.**

To prevail on either of her theories, plaintiff must first show that she was a qualified individual under the ADA.  Specifically, she must show that she is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position."  42 U.S.C. § 12111(8); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).

Under the first part of this definition, plaintiff must show that she had a "disability," which is defined as:  "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(a).  Plaintiff relies on the first definition and asserts that she has three "physical impairments" (carpal tunnel syndrome, chronic back pain, and fibromyalgia) and then argues that these impairments substantially limit the major life activities of walking, typing, sitting, lifting, and standing.

To support her claim that these impairments are substantial, plaintiff relies on the following evidence: she had a "lot of difficulty" walking; the pain from walking was "so excruciating, it's like I didn't know I had legs half of the time"; the problems with her hands made it "difficult" for her to type; that she has suffered from carpal tunnel syndrome since 2000 and it is a permanent condition; that her fibromyalgia is a chronic condition that causes fatigue and widespread pain in the muscles, ligaments, and tendons; and that she is limited in driving, cooking, and shopping. Although the District argues that plaintiff's disabilities are not serious, we find that plaintiff has established a genuine issue of material fact on this point.

Under the second part of this definition, plaintiff must show that she could do the essential functions of her job with or without reasonable accommodations. The District raises two primary arguments as to why plaintiff cannot satisfy this part of the definition. First, it argues that plaintiff could not meet the basic prerequisite of almost every job – namely, showing up for work on a regular basis. Second, the District argues that, even if plaintiff could show up for work, she could not do the essential functions of the job and that there were no reasonable accommodations available that would allow her to do so. We agree with both arguments.

### A. Regular Attendance

The first argument is straightforward. Can plaintiff convince a jury that she satisfied the essential element of showing up for work on a regular basis when she only showed up for work on 7 and 1/2 days over a 4-month period?

The Seventh Circuit has held that, subject to a few exceptions such as that of a substitute school teacher, regular attendance is a basic and essential function of every job. *See Jovanovic. v. In-Sink-Erator Div.*, 201 F.3d 894, 899-900 (7th Cir. 2000) ("Common sense dictates that regular

attendance is usually an essential function in most every employment setting; if one is not present, he is usually unable to perform his job.").  Relying on this rule, the Seventh Circuit has repeatedly affirmed summary judgment to employers where, as here, an employee did not show up for work on a regular or predictable basis.  *See, e.g., EEOC v. Yellow Freight System, Inc.*, 253 F.3d 943, 948 (7th Cir. 2001); *Jovanovic*, 201 F.3d at 899-900; *Byrne v. Avon Products, Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) ("Inability to work for a multi-month period removes a person from the class protected by the ADA."); *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927-27 (7th Cir. 2001); *Waggoner v. Olin Corp.*, 169 F.3d 481, 485 (7th Cir. 1999); *Corder v. Lucent Technologies*, 162 F.3d 924, 928 (7th Cir. 1998); *Nowak v. St. Rita High School*, 142 F.3d 999, 1003-04 (7th Cir. 1998).

　　In considering whether this rule applies here, we first must determine whether plaintiff's absences are of the same degree as those in the above cases.  In *Jovanovic*, the employee missed 24 days in a 12-month period.  201 F.3d at 899.  In *Waggoner*, the employee missed or was late for work 40 times in a 14-month period.  169 F.3d at 482.  Based on these two cases, we find that plaintiff's minimal attendance over this four-month period is of a similar nature.  Not only were these absences numerous, they were also unpredictable with constantly changing target dates on when plaintiff would return to work.

　　Plaintiff makes two arguments in response.  First, she argues that the amount of time was actually less than is portrayed.  She states that she was on vacation from June 22nd until July 6th; that some of the missed days were taken as "days off" on her attendance chart; that accrued paid time was applied to three of her absences in late July.  But these facts do not alter the analysis. Although plaintiff did take two weeks off as vacation time, the reason she took the time off was

because of her disability and because she had run out of sick leave.  Similarly, it does not really matter how her absences were coded on her attendance chart because the undisputed fact remains that all these absences were claimed to be due to her disabilities.

Second, plaintiff argues that it was not really her disabilities themselves that caused her to fail to show up for work but was the fact that the District failed to accommodate her which then "exacerbated" those disabilities.  As an initial matter, the evidence is far from clear that the alleged aggravation of her disabilities were due to working outside her medical restrictions, as plaintiff claims, rather than just from the disabilities themselves.  Dr. Leary's June 1st note, for example, stated that plaintiff needed to be off work because her disabilities had been aggravated due to her climbing up and down stairs "at her bank."  (Em. Ex. 2 – second page.)  Dr. Cantu's July 15th note states that her condition initially "flared up at home" and then was further aggravated at work.  (Em. Ex. 7.)  Moreover, it is important to note that the issue here is merely whether plaintiff could physically get to work and stay there for the day, sitting at her desk for instance, and not whether she could do all the tasks once she got there.  Plaintiff was apparently able to get to her many doctor appointments and her thrice-weekly physical therapy sessions.  In any event, we need not resolve these questions or further address this argument because this argument is not relevant unless plaintiff's medical restrictions could be viewed as a reasonable accommodation, which we conclude below they could not.

### B.        Essential Job Functions

Even assuming plaintiff could surmount this first argument, we still would grant summary judgment because, based on the same basic facts used to show that she was substantially impaired in performing numerous life activities, she could not perform the essential functions of her job.

The first step is to identify what these functions were. "To determine whether a job function is essential, we look to the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position." *Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005); *DePaolli v. Abbot Laboratories*, 140 F.3d 668, 674 (7th Cir. 1998) ("Although we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job.") (citations omitted).

In its Statement of Facts (# 13), the District stated that plaintiff job duties were to drive a van, carry things, work weekend events, time keeping, typing, making reservations, filing, and other tasks directed by Saperstein. In her response to Fact 13, plaintiff noted that she did not dispute this statement. Plaintiff's testimony at the EAB hearing and her affidavit also indicate that copying, including what is referred to as "mass copying," was an important part of her job. Another ongoing task was assembling "goodie bags," which was required for every special events and involved lifting and carrying boxes into and out of a van. In addition to these specific duties, plaintiff was also required to do whatever tasks Saperstein asked her to do. *See, e.g.* Tr. 42 (plaintiff testified that one of her duties was to do "anything else that was directed by Miss Saperstein"). This catch-all duty was consistent with the fact that plaintiff was the only person helping Saperstein. These facts are all undisputed.[4]

_____

[4]Even though plaintiff did not directly dispute these facts, she nonetheless tries to argue in her response brief that her job duties were more limited and specifically did not involve carrying heavy things or doing a lot of typing. Plaintiff bases this argument on a document entitled "JOB DESCRIPTION – CLERK IV," which she has submitted as an exhibit to her affidavit and which she claims was given to her in 1999 when she started working in the Special

The next question is whether plaintiff could perform these job duties with or without reasonable accommodation. Focusing first on whether she could do her job without accommodations, we find that it is clear she could not. During the week of July 23rd and 27th, in which she was asked to type invoices, carry things, and do what she described as her regular duties, it was too much for her. She also left work earlier in July for the same reason. Plaintiff has admitted that the mass copying was too difficult for her. Dr. Maskall testified at the EAB hearing that plaintiff could not drive a van, type for extended periods, nor lift boxes over 10 pounds.

The only remaining question is whether there was any reasonable accommodation available that would allow plaintiff to do these tasks or alternatively whether there was another job available that was open and that plaintiff could do given her broad-ranging disabilities. Before examining this question, we must digress briefly to acknowledge the role that the "interactive process" is supposed to play in this process. The ADA envisions that, once the

---

Events office. The District thereafter filed a motion to strike this document because plaintiff supposedly could not authenticate it. The District pointed out that it contained no seal and no District letterhead and thus could have been forged, although the District never explicitly indicated that it was untrue. We see no need to strike this document because, even if it is authentic, it is not relevant. As an initial point, the document contains no significant contradiction to the facts set forth above. Even a cursory review of this job description reveals that typing was an important function of the job. The description also refers to operating photocopiers. While the description does not specifically mention carrying boxes or assembling goodie bags, this is not dispositive because this is merely a general description and it is not customized for the job in the special events office and instead applies to all Clerk IV jobs including, for example, the job plaintiff previously held in the personnel office. Moreover, whatever general descriptions were set forth in a document given to plaintiff in 1999 must give way to the specific tasks required on the job two years later. Plaintiff has admitted that the various tasks that Saperstein asked her to perform in July 2001 were part of her job duties. Moreover, in the July 23rd meeting, both Colorton and Robinson confirmed this point as well, and plaintiff has not pointed to any fact that would suggest that the things Saperstein asked her to do in July 2001 were made-up or not necessary.

employee gives notice of a disability, the employee and employer then work together in an "interactive" or "consultative" process to determine "the extent of the disability and what accommodations are appropriate and available." *EEOC v. Sears*, 417 F.3d at 804; *Mays v. Pincipi*, 301 F.3d 866, 870 (7th Cir. 2002). However, even though the employer should consult with the employee, the employer is not required to provided the specific accommodation requested by the employee nor the one that is "ideal from the employee's standpoint." *Id.* at 872; *Jay v. Intermet Wagner.*, 233 F.3d 1014, 1017 (7th Cir. 2000) ("It is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests.").

When the interactive process fails to lead to a reasonable accommodation, courts then sometimes analyze whether one party was responsible for the breakdown in the interactive process. *EEOC v. Sears*, 417 F.3d at 805. But the Seventh Circuit has held that "[f]ailure to engage in this 'interactive process' cannot give rise to a claim for relief [] if the employer can show that no reasonable accommodation was possible." *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000). A court should thus first look to see whether there is any genuine issue of material fact as to the existence of a reasonable accommodation. If there is not, the court may "stop there." *EEOC v. Sears*, 417 F.3d at 805; *Mays*, 301 F.3d at 871 ("when no reasonable accommodation is possible the failure to jaw about accommodation is harmless").

Following this approach, we will consider whether any reasonable accommodation was available. We begin with the primary accommodation sought by plaintiff and the one she repeatedly requested (in various forms) during the summer of 2001, which was that she not have to do any task that would violate her medical limitations. Based on the undisputed facts, no

reasonable jury could find that plaintiff could do the essential functions of her job while following these restrictions.

The restrictions, which were less onerous initially, ended up consisting of the following requirements:  (i) no lifting greater than 10 pounds; (ii) avoid prolonged and repetitive climbing up and down stairs; (iii) avoid prolonged sitting of greater than 45 minutes, and (iv) avoid prolonged standing/walking of greater than 1/2 hour.  These restrictions are wide-ranging and have the effect of making it impossible for plaintiff to do many of her duties.  Based on her affidavit and EAB testimony, she could not have assembled the goodie bags nor have done the mass copying nor run any errands that required going up and down stairs nor have done typing projects of any length.  Additionally, according to her doctor, she could not drive a van.  These limitations are substantial, and do not even address the tasks that would have been interrupted by her need to change positions because she could not sit, stand, or walk for more than 45 minutes. In short, aside from some limited-duration or non time-sensitive typing and copying jobs, we cannot point to any tasks that would left for her to do once these other tasks were removed.

Plaintiff's testimony at the EAB hearing confirms this point:

> [The pain from my disabilities] made it very difficult for me to type.  It made it very difficult for me to carry the things up and down the stairs as Miss Saperstein requested.  It made [] it very difficult for me to carry and *do the things that I was requested [by Miss Saperstein] to do in regards to my job*.

(Tr. 50; emphasis added.)  Dr. Maskall also testified, very straightforwardly, at this same hearing that plaintiff  was not able to do the "required tasks" of her job.  (Tr. 120.)  If by her own admission she had "difficulty" doing the things her supervisor asked her to do, it is hard to see how she could do the essential functions of her job.  This is especially true where, as here, plaintiff was the only person designated to help Saperstein.

In her affidavit and response brief, plaintiff has tried to come up with some suggested accommodations that were more specific than this blanket request of adhering to medical restrictions. Her primary suggestion is that the District should get other people to do these tasks. She states that a secretary in the building could have helped her assemble goodie bags; that "other employees" such as maintenance people could assist her with heavy lifting; and that the District should hire two new people so that Saperstein "would not have felt like she had to work me to death." (Aff. Par 5.) She also suggests that Saperstein could have gotten the copying done at Kinko's.

These accommodations are unreasonable as a matter of law because they violate the Seventh Circuit's rule that an employer cannot be forced to accommodate one employee by having a second employee "follow her around," doing the tasks the first employee could not do. *Mays*, 301 F.3d at 871 (hospital was not required to "pair [one nurse who could not lift things over 10 pounds] with another nurse [] who would follow her around to help her lift patients"). This principle is illustrated in *Hansen v. Henderson*, a factually similar case. A postal worker with a herniated disc was having trouble performing his job, which required him to sort mail into 10 to 15 pound boxes, to carry the boxes to a truck, and to deliver the mail. 233 F.3d at 522. He sought an accommodation in which "another worker does the sorting, then gives Hansen the mail to case, and then when Hansen has done that carries the cases to the truck, and Hansen then makes just curbside deliveries." *Id.* at 523. The Seventh Circuit held that the ADA did not require that "[t]wo new jobs [] be manufactured – one for Hansen and one for his helper." *Id.* ("redundant staffing is not a reasonable accommodation"). For the same reasons, we find that the accommodations set forth above are unreasonable.

Plaintiff's only other suggestions relating to this particular job are that her tasks be "better organized" by (i) having her do the copying once or twice a day so that she would not have to make frequent trips up and down the stairs and by (ii) having the typing tasks be "spread out, rather than allowed to accumulate and then get dumped on my desk all at once, which was the normal routine." As for the copying suggestion, we fail to see how it would get around plaintiff's problems. While it might avoid one difficulty, going up and down the stairs, it would run into another, which is the problem of standing for a prolonged period. Moreover, it was not a practical solution according to plaintiff's own affidavit, which states that large copying projects "monopoliz[ed] the main copier" making "it difficult with constant interruptions of co-workers who needed to make copies as well." As for better organizing typing projects, there is no evidence that these projects could be done in small time increments and completed over a several-day period as plaintiff suggests, a possibility that would also run up against the fact that plaintiff was often absent. In July 2001, for example, Saperstein stated that she needed to have the invoices done that day, and plaintiff has not offered any evidence to dispute this assertion. Even if the copying and typing projects could have been organized better, plaintiff still would not have been able to drive the van nor do the other tasks described above.

The only other possible accommodation that has been suggested is reassignment to another job. Plaintiff first made this request in the July 23rd meeting during the last week she came to work. During that meeting, the District stated that there were no other jobs available that plaintiff could do. In her response brief, plaintiff has not established any evidence to rebut this point, which would normally be dispositive. *See Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001) ("It is plaintiff's burden to show that a vacant position exists for which he was

qualified.").  This issue is complicated, however, by the fact that the District in this case moved

for leave to file its summary judgment motion before discovery had been taken.  Although

plaintiff did not object to that approach when the District's original request was made, plaintiff

now complains (at p. 11 of her response brief) that she does not know whether another position

was open because she has not been able to conduct discovery.  We find that any additional

discovery on this issue would not make any difference because, as set forth below, the District

had a valid reason for firing plaintiff on October 1st and because it is undisputed that plaintiff was

not able to come to work at all in any job during the period from July 23rd, when the request was

first made, until October 1st.  Thus, even assuming another job was available, plaintiff could not

have taken advantage of it.

## II.     Was The Explanation For Firing Plaintiff Pretextual?

Plaintiff's other main argument is that the District's reason for firing her is pretextual and

was designed to cover up disability discrimination.  The District's official reason for firing

plaintiff is that she failed to show up for work three or more consecutive days without notifying

her immediate supervisor or designee.  Plaintiff argues that this reason is false because she kept in

"constant communication" with the District while she was absent.[5]

Based on the undisputed facts, plaintiff's assertion is simply not true.  Plaintiff's last day

of work was on July 27th.  She called into the office on July 30th and 31st and talked to Rebecca

Theadoris in the law enforcement department, another unnamed male law enforcement officer,

and Carol Tully, and asked them if they would make sure and tell Saperstein that plaintiff could

---

[5]Although the EAB Commissioner found that the District's official explanation for firing
plaintiff was not false and that it was in fact amply justified, the District has not made any formal
argument that this finding has any estoppel effect here with regard to this pretext argument.

not come in because of a reaggravation. Plaintiff also says that she also thereafter left a message on Saperstein's phone. On August 1st, Dr. Maskall wrote a note that plaintiff says she faxed to the District. It stated that she would be off for a "minimum of one month." (Tr. 121.) It is undisputed that, after this note, neither plaintiff nor her doctors ever contacted the District until October 1st.

One question that arises from these facts is whether either these calls by plaintiff or Dr. Maskall's August 1st note complied with the Rule's requirement that notice be given to plaintiff's "supervisor or designee" since they were never sent directly to Saperstein. On this issue, the EAB Commissioner noted, after analyzing these same facts, that plaintiff during this general period "went to great lengths to avoid direct contact with Ms. Saperstein" and that her decision on July 30th to call and tell a law enforcement officer that she would be absent rather than calling her direct supervisor was an "illogical approach that lacks any justification." Nevertheless, plaintiff has explained that, because Saperstein told her to leave a message with law enforcement personnel in the office, she therefore contacted Saperstein's "designee." Plus, plaintiff has testified that she left a message on Saperstein's voice mail.

Another question that arises is whether it is sufficient under the rule to give one advanced notice covering a set period of future absences. This appears to be plaintiff's argument. But even if we give plaintiff the benefit of the doubt and assume that Dr. Maskall's August 1st note constituted sufficient notice for a month of absences, this leaves a rather large gap of the entire month of September during which plaintiff never made any contact – no phone call, no fax, no

doctor's notes.[6]  This is certainly not "constant communication" as plaintiff tries to argue  and,

under any reasonable interpretation of this rule, plaintiff was in violation which in turn was

grounds for termination.

Plaintiff seems to believe that the District had no right to enforce this rule because it

supposedly knew that plaintiff was having problems with her disabilities and therefore it could

have made an educated guess that her failure to check in during September was because she was

still out struggling with her disabilities.  This is not a valid excuse either under the literal terms of

the policy or as a matter of common sense.  The District's rule, on its face, contains no language

suggesting that an employee may give one notice that would function as a blank check, enabling

her stay out of work for an undefined and lengthy period of time without ever being required to

ever check in and explain what is going on.

This rule, which plaintiff has never claimed was applied in an arbitrary or haphazard

manner, addresses legitimate business concerns.  First, even if the District believed that plaintiff

*may have* been out due to her disabilities, it had a right to receive a clear answer.  Plaintiff may

have decided that this job was not a good fit; she may have accepted another job.  Second, even if

the District *knew for certain* that plaintiff was merely out due to her disabilities and fully intended

on returning, it still had a right to require that she keep the District informed about the details of

her condition and the progress of her recovery to know (among other things) how to cover her

duties while she was gone, whether for example to hire a short-term or long-term substitute or to

make other arrangements.

_____

[6]*See* Tr. 90 ("Q.  And during August you did not contact your immediate supervisor or
somebody in personnel and say I'm sick and I cannot work?  A.  No, I did not.  Q.  And you
didn't do that in September either, correct?  A.  No I did not.").

While plaintiff's unexplained absences from September 1st to September 19th provide an objective basis for the District's decision, there is more. The District did not send a letter stating that plaintiff had *already* been fired. Instead, it sent her letter on September 19th, indicating that the District believed that she had abandoned her job and that a hearing had been set on October 1st. Plaintiff acknowledges receiving this letter on September 21st – ten days before the hearing. To the extent that she believed that Dr. Maskall's August 1st note constituted effective notice without the need to ever again call in, she could not have continued to maintain this belief after receiving this letter.

Still, during the ten-day period leading up to the hearing, she never contacted the District to indicate that she had not abandoned her job. No call, no fax, no doctor's note. This is true despite the fact that plaintiff previously had contacted numerous people at the District, including people in the human resources department, law enforcement, and even the switchboard operator. She had the fax number memorized and had repeatedly had arranged for her doctors to fax notes. She even had her worker's compensation attorney write letters to the District's legal counsel to complain about things. If there is any fact beyond dispute in this record, it is that plaintiff knew had to get in touch with the District if she wanted to do so. Moreover, as the EAB Commissioner rightly observed, plaintiff was a "former personnel staff member" who was "familiar with office procedures, including those governing attendance, notification and leaves." Despite all this, she made no contact and did not even show up for the hearing.

Why? She does not even address the question directly in her response brief. The ostensible explanation from her statement of material facts is that she had a conflicting doctor's appointment but this fails to explain why she did not reschedule it. At the EAB hearing, she tried

to create the impression that Dr. Maskall told her she had to miss the hearing because her "health comes first." But this is misleading. Dr. Maskall was asked about this issue at the EAB hearing and he stated that he never told her to miss the hearing and in fact was not even aware there was a conflict. He also stated that plaintiff was the one who picked the date for the appointment and that he had no input. As for the comment that plaintiff's health comes first, that was merely a boilerplate comment about the general importance of not missing doctor's appointments and was not related to this particular appointment. No evidence suggests that there was any time-sensitive medical reason why plaintiff had to see Dr. Maskall at exactly at 10:00 a.m. on October 1st. She therefore could have rescheduled the appointment for the day before or the day after or even for later that same afternoon after the hearing was over. Or just as easily, she could have called the District and asked that the hearing be rescheduled. A phone number was listed on the letter. Even if the District had been unwilling to reschedule, which seems unlikely, it would have at least known that plaintiff was contesting the charge of job abandonment. Yet, for reasons that are not clear, plaintiff did not take this simple step.

However, after her 10:00 appointment with Dr. Maskall on October 1st, plaintiff for some reason woke up and had a series of notes sent to the District. She first had Dr. Maskall's office fax a note to the District explaining that plaintiff was almost ready to return to work.[7] On

---

[7]A factual dispute exists as to whether this note was actually faxed to the District. Dr. Maskall testified at the EAB hearing that his office did not have a fax machine at that time, and the EAB Commissioner found that this testimony contradicted plaintiff's testimony that the October 1st note was faxed from Dr. Maskall's office. Plaintiff has attempted to resolve this apparent contradiction here by explaining that the fax machine used by Dr. Maskall's assistants was in a common area shared by Dr. Maskall and several other doctors. In other words, plaintiff is suggesting that Dr. Maskall was using the word "office" in a fairly technical manner. This is a fact question that, on summary judgment, must be construed in plaintiff's favor.

October 2nd, she had her worker's compensation attorney write a similar letter to the District's counsel. On October 4th, she had Dr. Cantu fax a note to the District stating essentially the same thing as Dr. Maskall.

But this last-minute flurry, which stands in stark contrast to the two-month-long period of silence, does not provide evidence of pretext. The District was not required to accept these after-the-fact excuses nor change its decision. Plaintiff had been given several chances. And the District had already unnecessarily expended resources in pursuing this matter, in preparing for and attending the hearing. Saperstein, the hearing officers, and also Joanne Robinson took time out of their schedules to attend a hearing that plaintiff never had any intention of attending. They sat around waiting for her.

Based on these undisputed facts, no reasonable jury could find that the District's explanation for firing plaintiff was unreasonable when plaintiff failed to provide any explanation for at least a month of missed work, failed to respond to a letter stating that the District believed she had abandoned her job, and failed to show up for her termination hearing.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted.

**ENTER:**

_____
**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** June 7, 2006